**UNITED STATES of America**

**v.**

**William Joseph HALL.**

**Crim. No. 83–00050–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

March 5, 1984.

N. George Metcalf, Asst. U.S. Atty., Richmond, Va., for plaintiff.

## ORDER AND OPINION

WARRINER, District Judge.

Presently before the Court is an application of the United States Attorney for the Eastern District of Virginia by N.G. Metcalf, Assistant United States Attorney for the Eastern District of Virginia, for an order for production of Master Card credit card records pursuant to the All Writs Act, Title 28 U.S.C. § 1651.

On 23 June 1983, the defendant, William Joseph Hall, was indicted in this Court for violations of 18 U.S.C. § 751. On 15 August 1983, a warrant for his arrest was issued. Since that time, however, the defendant has concealed himself and remains a fugitive. On 2 August 1982, an associate of defendant Hall, one Jerry M. Fields, was in the Jacksonville, Florida, area using a Master Card credit card of Kathleen H. Manning, a previous girlfriend of Hall's, and still believed to be in close contact with him. Kathleen Manning was also in the Jacksonville, Florida area at that time, but an attempt made by the United States Marshal in Jacksonville to apprehend Hall in Manning's motel room was unsuccessful. Since 2 August all contact was lost with Manning, Fields, and Hall, but on 28 November 1983, information was developed by the Marshal that defendant Hall recently transferred two parcels of real estate to Kathleen Manning.

On the strength of this sequence of events, sworn to by affidavit, the United States Attorney has sought an order from this Court directing the Citibank, Mastercard Division, Melville, New York, to produce the Master Card credit card records for Account No. 5424–1800–2835–8825 subscribed to by Kathleen H. Manning, whose last known address was 7818 Bothwell Street, Reseda, California, for the period August 2, 1981 to the present.

The United States relies on Title 28 U.S.C. § 1651, the All Writs Act, which provides:

718

The Supreme Court and all courts established by act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law. ■ The statute is in no way jurisdictional; it neither enlarges nor expands jurisdiction of the court; it may be invoked only to aid jurisdiction which the Court already has. *United States ex rel Wisconsin v. First Federal Savings & Loan Association*, 248 F.2d 804, 808 (7th Cir.1957), cert. denied, 355 U.S. 957, 78 S.Ct. 543, 2 L.Ed.2d 533. See also *Benson v. State Board of Parole and Probation*, 384 F.2d 238, 239 (9th Cir.1967), cert. denied, 391 U.S. 954, 88 S.Ct. 1860, 20 L.Ed.2d 869. Thus, while 28 U.S.C. § 1651 may be relied upon by the courts in issuing orders appropriate to assist them in conducting factual inquiries, *Harris v. Nelson*, 394 U.S. 286, 299, 89 S.Ct. 1082, 1090, 22 L.Ed.2d 281 (1969), reh. denied, 394 U.S. 1025, 89 S.Ct. 1623, 23 L.Ed.2d 50, the All Writs Act is not a means by which a district court may extend its authority in areas where it otherwise has no jurisdiction.

As the United States candidly admits in its brief, there is neither statutory nor case law which specifically allows or forbids a district court to issue an order by which a bank may be compelled to produce the credit card records of an individual because that individual has been the known consort of a fugitive. The closest parallel developed by the courts has been the series of cases involving the installation of telephone pen registers. The case which is simultaneously the acme of such litigation and the standard by which such procedures are now judged is *United States v. New York Telephone Company*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977).

In *New York Telephone*, the Supreme Court held that a district court had ample authority to do two things: (1) to order installation of such pen registers and (2) to force the New York Telephone Company to assist the Federal Bureau of Investigation in doing so. *New York Telephone* at 169 and 171, 98 S.Ct. at 370 and 372. The Supreme Court, mindful that the All Writs Act cannot be used to extend jurisdiction, looked first at the independent authority the district court had to issue that portion of the pen register order authorizing agents of the FBI to install and use pen registers. The Court found first that Title III of the Omnibus Crime Act, dealing as it does with the aural interception of telephone conversations, could not provide that jurisdictional basis. The Court then looked at Fed.R.Crim.P. 41(b) which authorizes the issuance of a warrant to:

Search for and seize any (1) property that constitutes evidence of the commission of criminal offense; or (2) contraband, the fruits of crime, or things otherwise criminally possessed; or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense.

The Court, making reference to its earlier holding in *Katz v. United States*, 389 U.S. 347, 352, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), stated that Rule 41 is not limited to tangible items but is flexible enough to include electronic intrusions authorized upon a finding of probable cause. The Court found support for its conclusion that Rule 41 authorizes the use of pen registers by Fed.R.Crim.P. 57(b), which provides: "If no procedure is specifically prescribed by Rule, the court may proceed in any lawful manner not inconsistent with these Rules or with any applicable statute." The Supreme Court concluded that Rule 41, buttressed by Rule 57(b), was sufficiently broad to include seizures of intangible items, such as dial impulses recorded by pen registers, as well as tangible items. *New York Telephone*, 434 U.S. at 170, 98 S.Ct. at 371.

In applying this threshold jurisdictional test to the facts of the case before this Court, it is apparent that credit card records *qua* records have no inherent nature, no quality, that would render them not seizable by a properly executed search warrant. Although these records exist as electronic impulses in the storage banks of a computer, a paper print-out will contain

information such as that sought by the United States Attorney. Reasoning analogously, if the Supreme Court has held that an intangible, such as an electronic dial impulse emitted by a telephone may be "seized" and recorded, there is no difficulty in saying that the records of purchases and loans made on a given credit card account number cannot also be seized, provided the Court has an independent jurisdictional basis for its order.

In the present case the basis is in some respects more clear than it was in *New York Telephone*. Defendant is a fugitive from the duly issued warrant of arrest from this Court. Rule 41 in tandem with Rule 57(b) assuredly permits seizure of property such as the record of credit card expenditures evidencing defendant's continued criminal activity, *viz.*, remaining a fugitive. There is, in short, a jurisdictional basis under the Federal Rules of Criminal Procedure similar to that found to exist by the Supreme Court in *New York Telephone*.

The key question here, and the one which the Supreme Court addressed next in New York Telephone, was whether or not a *third party* could be compelled by court order to assist the FBI in installing such pen registers. The Supreme Court stated at 172–73, 98 S.Ct. at 372:

> This Court has repeatedly recognized the power of a federal court to issue such commands under the All Writs Act as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained: this statute has served since its inclusion, in substance, in the original Judiciary Act as a "legislatively approved source of procedural instruments designed to achieve the 'rational ends of law.'" *Harris v. Nelson*, 394 U.S. 286, 299 [89 S.Ct. 1082, 1090, 22 L.Ed.2d 281] ... (1969), quoting *Price v. Johnston*, 334 U.S. 266, 282 [68 S.Ct. 1049, 1058, 92

L.Ed. 1356] ... (1948). Indeed, '[u]nless appropriately confined by Congress, a federal court may avail itself of all auxiliary writs as aids in the performance of its duties when the use of such historic aids is calculated in its sound judgment to achieve the ends of justice entrusted to it.' *Adams v. United States ex rel McCann*, 317 U.S. 269, 273 [63 S.Ct. 236, 239, 87 L.Ed. 268] (1942).

The Supreme Court clearly recognized in *New York Telephone*, however, that the power of a district court to use the All Writs Act to compel a third party to assist its processes was not unlimited and accordingly established three requirements which set the boundaries for the use of the All Writs Act to order a third party to assist law enforcement agencies: (1) the third party must be closely connected with the underlying controversy—in *New York Telephone*, a gambling investigation; here, location of a fugitive; (2) the order must not adversely affect the basic interests of the third party or impose an undue burden; (3) the assistance of the third party must be absolutely necessary.[1]

These tests are drawn from an analysis of the Supreme Court's discussion of New York Telephone's refusal to lease lines to the FBI which were needed to install the pen registers in an unobtrusive fashion. The telephone company had suggested instead that the agency string cables from the subject apartment to another location. *New York Telephone*, 434 U.S. at 174–77, 98 S.Ct. at 373–74. The FBI determined that to follow the company's advice would be to defeat its investigatory purposes because the suspects would become alarmed. The Supreme Court stated first that the telephone company was not so far removed from the underlying controversy that its assistance could not permissibly be compelled; a United States District Court had found probable cause to believe the company's facilities were being employed to facilitate a gambling enterprise on a continuing

---

**1.** See Case Comment, Use of the All Writs Act to Compel Citizens to Assist Law Enforcement Agencies, or The Posse Rides Again—*United States v. New York Telephone Co.*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1978), 12 Suffolk Law Review 1027 (Summer, 1978).

basis. *New York Telephone* at 174, 98 S.Ct. at 373. Second, the use of pen registers was by no means offensive to company policy or practice; the telephone company itself regularly and voluntarily employed pen registers for the purpose of checking billing operations, detecting fraud, and preventing violations of law. The court order was in no way burdensome, providing as it did that the company be fully reimbursed at prevailing rates; nor did compliance with the order require other than minimal effort on the part of the company, while no disruption occurred to its operations. Id. at 175, 98 S.Ct. at 373. Finally, the Supreme Court pointed out that without the company's assistance there was no conceivable way in which the surveillance authorized by the district court could have been successfully accomplished. The provision of a leased line by the company was essential to the fulfillment of the purpose—to learn the identities and degree of participation of those connected with the gambling operation without alerting these suspects. Id.

In determining, therefore, whether to enter the order requested by the United States Attorney, this Court must apply the three-pronged test derived from *New York Telephone* to the facts of the present case. First, is the third party, Citibank, closely connected with the primary action? The answer must be a qualified yes. The analogue in this case to the investigation of gambling in *New York Telephone* is the attempt to locate a fugitive from justice, defendant Hall. Ms. Manning, his former girlfriend, if she be assisting him in eluding arrest, has made herself a party to his efforts to elude apprehension. The question is whether Citibank has the kind of close connection with that crime which the Supreme Court found to exist between New York Telephone and the FBI's attempt to install pen registers.

In *New York Telephone*, it was that company's telephone lines which were being used for an illicit purpose: the placing of gambling bets. Here Citibank has issued a line of credit to Kathleen Manning. She may be using her credit card to support, to harbor, a fugitive. But it is highly likely that her activities in support of this admittedly criminal aim are in and of themselves not criminal. For example, she may be using her credit card to buy the defendant food. Harboring a fugitive is against the law; purchasing grits is not. From the point of view of Citibank, the only crime which would be inextricably connected to *its* records would be Kathleen Manning's engaging in some sort of fraudulent behavior with respect to her credit card; for example, borrowing large sums on the credit card with no intention of ever repaying them. In *New York Telephone* the telephone calls themselves were illegal. They were involved directly with the placing and laying-off of illegal bets. Nevertheless, a parallel does exist.

Looking closely at *New York Telephone*, we see a public utility which engages in a service. It provides telephone calls whereby Party A can pick up a receiver, dial a number, and talk with Party B. Placing telephone calls is not illegal; engaging in a gambling operation is. When a party uses that telephone to place gambling bets, he is taking the facilities rented or supplied to him by the telephone company and using them for an illegal purpose. Analogously, when a credit card is used for an illegal purpose even though the act itself be not illegal (just as the act of making a telephone call is not itself illegal) the credit card issuer has an interest in that transaction.

Granted, the credit card issuer in the instant case is not as closely connected with defendant Hall's efforts to avoid capture as *New York Telephone* was with the gambling investigation. But the Supreme Court did not instruct us to find intimate connection, inextricable connection, but only close connection, and I believe that such close connection exists in the instant case. As the Court noted, "The power conferred by the Act extends, under appropriate circumstances, to persons, who though not parties to the original action or engaged in wrongdoing, are in a position to

frustrate the implementation of a court order or the proper administration of justice." [Citations omitted]. Id. at 174, 98 S.Ct. at 373. The defendant here has eluded the authorities for eight months. While Citibank may not be in a position to frustrate the proper administration of justice, its refusal to help law enforcement efforts, when it has the ability to do so, could materially retard the efficient administration of justice.

The second criterion which the Supreme Court established was that the order must not affect a basic interest of the third party or impose an undue burden. This criterion can be met readily. Citibank is in the business of, in effect, issuing credit. It permits individual customers to use a Master Card credit account to buy goods at numerous stores, and to purchase services at a variety of places. Citibank in turn reimburses the purveyor of those goods and services and earns what is basically a commission for having absorbed from the purveyor the risk of delayed or nonpayment. This basic interest of the third party, Citibank, is not going to be affected by its compliance with this order, unless one argues that persons will not apply for Master Cards because those credit card records may be used by federal investigatory agencies.

The Supreme Court also commented:

Moreover, it can hardly be contended that the Company, a highly regulated public utility with a duty to serve the public had a substantial interest in *not* providing assistance.

*New York Telephone* at 174, 98 S.Ct. at 373.

Withholding information that could lead to apprehension of a fugitive in no way serves Citibank's interests. Indeed, presumably, it is in Citibank's interest to prevent the line of credit given Manning from being used to support a fugitive, if such allegation prove true. Finally, as the Supreme Court stated, "The conviction that private citizens have a duty to provide assistance to law enforcement officials when it is required is by no means foreign to our traditions." Id. n. 24 at 175, 98 S.Ct. n. 24 at 374.

Nor is an undue burden imposed on Citibank. Credit card corporations routinely, indeed monthly, compile a list of all the purchases and the amounts of those purchases, the so-called cash advances, and the amount of those advances, and present them to their customers for payment. All that is involved in complying with this court order is duplicating these records for the government by punching a few buttons. Nor is the non-disclosure by Citibank to Manning of the fact that the records are being sought burdensome.

Finally, the Supreme Court has said that the assistance of the third party must be absolutely necessary. In New York Telephone there was no question that the assistance of the telephone company was essential to the FBI purpose of placing a pen register on telephones in such a way as not to attract attention and illegal gambling is utterly dependent upon the telephone. The Court commented on the fact that New York Telephone was not only a utility, but at that time a monopoly. We are not faced with such an entity in this case. There are many means whereby a fugitive may be apprehended. There are many means whereby a fugitive may pay the costs of his concealment without recourse to credit cards—his own or another's. There is no one person, no one agency, no one entity on whose assistance locating a fugitive is utterly dependent. However, efforts so to locate the defendant in this case have failed. Up to the 28 November 1983 transfer of realty from defendant to Manning, the sole indication of defendant's whereabouts available to law enforcement officers was the unsuccessful attempt to arrest the defendant in the motel room of Kathleen Manning—the individual whose credit card records are being sought.

Defendant Hall, Ms. Manning, and Mr. Fields are apparently close companions; under oath, the United States Marshal has testified that these last two named individuals have been assisting the defendant in his efforts to flee the jurisdiction of this

Court. Logic compels me to say that finding Manning, while not guaranteeing success in locating defendant, would certainly be a step in that direction.

Given then that locating Manning would materially assist in the apprehension of defendant Hall, given that records of her credit card expenditures would facilitate efforts to find Manning, Citibank's assistance in producing those records is absolutely necessary.[2] Indeed, no one else *can* do so; there are no alternative means.

It is hereby ORDERED, pursuant to 28 U.S.C. § 1651, that the Citibank, Mastercard Division, Melville, New York, produce and deliver to agents of the United States Marshal's Service on or before 12 March 1984, the Mastercard credit card records for account number 5424–1800–2835–8825 subscribed to by Kathleen H. Manning for the period from 2 August 1981 to the present;

It is further ORDERED that the Citibank, Mastercard Division, of Melville, New York, and its agents and employees make no disclosure of the existence of this Application and Order for production or of any production of records made thereunder unless and until authorized by this Court;

It is further ORDERED that the Clerk of this Court seal the Application for Production of Credit Cards and this Order until further order of this Court.

Let the Clerk send a certified copy of this Order to the Marshal's Office for service.

And it is so ORDERED.

---

**2.** I read *New York Telephone* at 175, 98 S.Ct. at 373 to indicate that the absolute necessity refers not to catching the fugitive but to obtaining the credit records. Only in this sense is the cooperation, or obedience, of Citibank absolutely necessary.